UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

UNITED STATES

v.                                          Case No. 3:25-MJ-470-HTC

DENNIS R. DECAPRIO
_____/

MEMORANDUM OPINION ON BENCH TRIAL

Defendant Dennis R. DeCaprio has been charged by information with one count of simple assault on his wife, L.T, in violation of 18 U.S.C. § 113(a)(5). The Court held a bench trial on January 26, 2026. Based on the evidence presented at trial and for the reasons set forth below and in open court, the Court finds Defendant NOT GUILTY of the offense charged.

I.   **Evidence Presented at Trial:**

The evidence at trial established that on July 15, 2025, Defendant and L.T. were instructing a motorcycle riders class at Corry Station, Pensacola, Florida, when the two had a verbal disagreement over where the Defendant was positioned on the course during the practical aspect of the instruction. The verbal disagreement continued while Defendant was putting motorcycles into the CONEX boxes located near the course, and escalated as the two were in Defendant's truck driving to the classroom to continue the theoretical instruction.

Evidence concerning the dispute between the Defendant and L.T. and the events leading to Defendant's arrest included testimony from L.T., Officer S. Roa (the responding officer), and Defendant. Additionally, some of the events in question were captured on L.T.'s Meta glasses and the truck's dash camera. As discussed more below, L.T.'s and the Defendant's accounts conflict. Those testimonies and the video evidence are summarized below.

A.   **L.T.'s Testimony**

According to L.T., despite the verbal dispute, she got into Defendant's truck so they could head to the classroom. Once inside the truck, Defendant continued to

verbally insult her and curse at her, drove aggressively – turning the wheel back and forth, and wanted to hit her. She, thus, wanted to get out of the truck and "jumped" out when she saw a police car patrolling the area. After she got out of the truck, she hid behind some trees, but the Defendant found her as he was driving around with his truck.

At one point, as she starts crossing a road to go into a building, the Defendant stops the truck and starts backing up, "burn[ing]" the asphalt. The truck was coming in her direction, and she ran when she saw the backup lights. She tried to get on the grassy area because she was afraid Defendant was trying to run her over with the truck. When she saw the truck, she was scared and felt like her life was in danger. She did not know what speed the truck was traveling. Once she got into the building, she saw a police officer and gave her statement to the officer. That officer was Officer Roa.

L.T. admits, however, that Defendant never hit or laid his hands on her.

**B.     Officer Roa's Testimony**

According to Officer Roa, she was patrolling the perimeter at Corry Station when she observed Defendant's truck over by the motorcycle course, driving at a high rate of speed. As the truck was coming around the corner of the CONEX boxes, it looked like it was about to do donuts. Around that time, however, she received a call for service for a medical emergency and, thus, had to leave the area. She returned to the area about 5 minutes later and saw L.T. walking down the road. L.T. waved her down.

L.T. looked emotionally distressed, was crying and shaking, and stated she needed help. She said that she and Defendant were both instructors and got into an argument. The Defendant became aggressive, and she told him she was going to call the police. When Defendant slowed the truck down, but while it was still moving, she jumped out of the truck and had to jump into the bushes to avoid being hit. L.T. was evaluated by medical and, based on L.T.'s statement, the Defendant was arrested.

After Defendant was taken into custody and advised of his *Miranda* rights, Defendant gave a voluntary statement and told Officer Roa that L.T. assaulted him and attempted to choke him and rip his shirt off. L.T. also tried to get him to hit her. Officer Roa, however, did not notice any marks on the Defendant or that his shirt was ripped.

Officer Roa also admitted that even though L.T. stated that she jumped out of the truck onto asphalt, she did not observe any rips in her clothing or scrapes on her hands. Additionally, Officer Roa stated L.T. admitted Defendant never touched her during the incident.

### C.     The Defendant's Testimony

The Defendant testified that the argument between him and L.T. started after the practical aspect of the instruction was over and she complained to him that he was not respecting her as an instructor/coach. As he was trying to put the motorcycles away during the break between the practical instruction and the classroom instruction, L.T. continued to "carry on," so he told her to stop whining and insulted her several times. She told him to hit her, and he said no. She then grabbed him and put her hands on his throat.

Once back inside the truck, after picking up some 2 x 4's, L.T. said something to him, and he insulted her again. She then grabbed his collar and yanked on it. He did not put his hands on her even though she told him to hit her. He claims he never tried to hit her. However, because she had blindsided him when she grabbed his collar, he put his arm up and raised his fist at her in a defensive move in case she tried to grab him again. At that point, he tried to get the attention of the patrol car but was unable to do so.

After L.T. got out of the truck, Defendant put away the 2 x 4's and then drove around to find her to go to the classroom with him. He did not see her in his vision when he backed up the truck. According to Defendant, L.T. was never behind the truck but was on the right side of the truck in the grassy area when he backed up the truck. He never intended to scare her or intentionally put her in fear.

### D.     The Video Footage

L.T. was wearing Meta glasses and recorded some of the interaction on the camera that comes with the glasses. What was captured by the glasses is up to L.T. because she must push a button on the glasses to start and stop the recording. Additionally, she also downloaded video footage from the truck's dashcam. As discussed below, the video footage, however, does not tell the whole story and what is shown calls into doubt the truthfulness of L.T.'s testimony and the statements she made to Officer Roa.

The Government admitted into evidence a thumb drive containing 4 different videos, labeled 1A through 1D.

Footage 1A, which was captured by the Meta glasses, begins with the Defendant and L.T. in the truck. The Defendant is seen in the driver's seat. L.T. can be heard but not seen. The collar of Defendant's t-shirt can be seen stretched and pulled almost past his shoulder. The Defendant is visibly angry and in one brief second turns toward L.T. with his arm raised and his hand clenched in a fist, appearing to lean toward the direction of L.T., before turning back toward the driver's side window and putting his hands back on the wheel to turn it to the right. As the Defendant raises his arm, L.T. can be heard saying to the Defendant "hit me." The Defendant does not, and instead says, "there is a cop right there" and proceeds to drive toward the patrol car, honking to get the officer's attention.

Seconds later, as the truck approaches the patrol vehicle (which is driving away), L.T. can be seen grabbing the door's upper handlebar and saying "he hit me, he hit me. I show you." She then calls out "Policia" but the patrol car continues to drive away. She tells Defendant she wants him to stop the car. The Defendant continues to drive for approximately 6 more seconds, across the grass, between the CONEX boxes and back to the asphalt motorcycle course, before stopping the truck. Once the truck stops, L.T. gets out of the truck and runs back onto the grassy area where the patrol car was traveling, but it is no longer in sight. The video shows L.T. running for approximately another 20 seconds before the video stops recording.

Footage 1B, which was also captured by L.T.'s Meta glasses, records L.T. as she is walking around Corry Station. In the video, L.T. can be heard saying "I'm afraid of my husband, he hit me, I'm looking for police." L.T. appears to be speaking to herself or for the camera.

About 5 seconds into the video, Defendant's truck comes into the screen. As he is driving, the Defendant yells to L.T. "let's go." She responds, "no, I'm looking for the police. I don't go with you, you go." The two continue to speak – the Defendant says, "Don't come home" and L.T. says, "okay, I don't." L.T. appears to be walking behind the truck, a good distance away from the truck, and to the side of the truck as it is moving ahead of her. Additionally, there is a row of bushes between L.T. and the truck. This video stops as the truck drives away.

Footage 1C is from the truck's dashcam. It shows the truck driving around the motorcycle course and the Defendant can be heard telling himself that he does not know where L.T. went. About 38 seconds later, the Defendant appears to spot

L.T. and asks her if she's "done f_ing around." The truck continues to drive in the area where L.T. is walking and the Defendant tells L.T., "let's go." This is the same sequence that is captured by the Meta glasses in Footage 1B. Unlike the footage captured by the Meta glasses in Footage 1B, however, the dashcam footage shows L.T. walking to the side of the truck, on the other side of the bushes on the paved roadway.

At 1:23 of the video, the truck is seen heading toward the roadway and getting on the roadway, well ahead of L.T. The truck stops at 1:29 on the video and then Defendant accelerates briefly and begins driving backwards on the roadway, before coming to a complete stop at 1:40. The Defendant can be heard getting out of the truck and appears to be walking toward L.T. because voices can be heard some distance from the truck. Defendant tells L.T., "Your last chance, are you coming home or not, coming home?" There is a pause as if L.T. is saying something in response, but her voice cannot be heard. The Defendant then says, "you going to hit me some more," before he insults L.T. again, and gets back into the truck. This exchange lasts for approximately 30 seconds. At 2:07, L.T. can be seen again in the camera's view, walking well ahead of the truck, on the grassy area on the other side of the roadway, toward some buildings. Once back inside the truck, the Defendant yells "bye bye" and drives away.

<u>Footage 1D</u> captures part of the events that are contained in Footage 1C, except that it is from the Meta glasses. It starts with footage of the truck on the paved roadway backing up. Based on the angle of the camera, L.T. is not behind the truck as it starts to back up. Instead, she is to the side of the truck on the grassy area. L.T. then walks away from the truck, staying to its side before turning back around toward the truck. L.T. then walks behind the truck, while it is stopped, and crosses the roadway to the left side of the truck. L.T. can be heard saying, "he is nervous, he wants me to go with him, I don't go," before the recording stops. L.T.'s narrative appears to be for the camera.

The Defendant also admitted video footage from the Meta glasses and the dashcam into evidence. While some of the footage is similar to the footage admitted into evidence by the Government, there are also some additional events captured in the Defendant's videos.

The footage from <u>Video 1</u> starts with L.T. recording her interactions with the Defendant while the two are still at the motorcycle course and the Defendant is putting motorcycles into the CONEX boxes. As Defendant is doing so, L.T. can be heard telling the Defendant to "respect" her as a "coach" and that she is not his wife

when they are instructing. This video corroborates the Defendant's recitation of the events - that the two's argument continued as he was putting the motorcycles away.

The footage from <u>Video 2</u> is from inside the truck and shows the Defendant getting out of the truck to get 2 x 4's. The importance of this video, according to the Defendant, is that it shows the shirt of his collar is intact and unstretched.

The footage from <u>Video 3</u> is identical to the Government's footage 1A.

The footage from <u>Video 4</u> is the same as the footage in Government footage 1B, except slightly shorter.

The footage from <u>Video 5</u> is the same as the Government's footage 1D, except shorter.

## II. Discussion

Because 18 U.S.C. § 113(a)(5) does not define the term "assault," courts have looked to the common law meaning of assault. *See United States v. Alvarez-Murillo*, 722 F. Supp. 3d 648, 650 (W.D. Tx. 2024). Under the common law, "assault" has three meanings – (1) an attempted battery[1]; (2) an actual battery; and (3) an act that puts another in reasonable apprehension of bodily harm. *See id.*; *see also, United States v. Dellis*, 558 F.3d 177, 180 (2d Cir. 2009) (referencing Blackstone's definition of assault as "an attempt or offer to beat another, without touching him: as if one lifts up his cane, or his fist, in a threatening manner at another; or strikes at him, but misses him").

In this case, the Government has charged Defendant with two acts that it contends put L.T. in reasonable apprehension of bodily harm: (1) the Defendant raised his fist to L.T. while the two were in the truck; and (2) the Defendant threatened her with his truck when he backed it up on the roadway.

The Court has considered the testimonies of Officer Roa, L.T., and the Defendant, as well as the video evidence, and finds the evidence is insufficient to prove the elements of the offense beyond a reasonable doubt.

---

[1] A "battery" at common law means "a harmful or offensive contact" with another. *See Alvarez-Murillo*, 722 F. Supp. 3d at 650.

3:25-mj-470-HTC

First, the video evidence does not show beyond a reasonable doubt that the Defendant assaulted L.T. with his truck. Notably, there is no video showing L.T. standing behind the truck when the Defendant backed it up on the roadway. Instead, the video footage, when viewed together, shows L.T. walking or standing some distance from the truck and either to its right or left side. Moreover, once the Defendant stopped the truck, he gets out to talk to L.T. and tries, a final time, to get her to leave with him. When L.T. makes it clear that she is not going to go with him, he drives away. The video footage does not show L.T. running from the Defendant or the truck as it is backing up and it does not show her having to jump in the bushes to avoid getting hit as she contends. To the contrary, L.T. is seen, at various points during that interaction, simply walking away from the truck toward the buildings, and talking to the Defendant. The videos do not show Defendant taking any action that would have caused a reasonable apprehension of bodily harm.

Second, the Court does not find the Government's evidence to show beyond a reasonable doubt that Defendant created a reasonable apprehension of bodily harm when he raised his arm and fist in L.T.'s direction. The Court finds it significant in this case that L.T. controlled when to turn on and off the Meta glasses and was also responsible for downloading the video footage from the dashcam.[2] The video evidence, however, is missing a key sequence in the events that took place that day - namely, there is no recording of what happened in the truck immediately before Defendant raised his arm and fist, including how Defendant's shirt got stretched and whether L.T. had just hit or grabbed Defendant as he contends. That missing sequence is particularly important here because it is relevant to showing whether L.T.'s subjective fear for her safety was objectively reasonable. *See United States v. Hawkins*, 303 F. App'x 17, 18 (2d Cir. 2008) (affirming conviction for simple assault where evidence of verbal assaults combined with defendant's aggressive physical acts supported a finding that the victim's subjective fear was "objectively reasonable"). For example, if during the disagreement L.T. had been the aggressor and had either grabbed or struck Defendant and Defendant had not retaliated or touched L.T. in response, then any fear he would have done so at that instant may not be objectively reasonable.

It is also important because the Court does not find L.T.'s testimony regarding that missing sequence to be entirely credible. For starters, on cross-examination, L.T. initially denied having touched the Defendant and testified that "maybe

---

[2] Although L.T. was asked whether she controlled what was recorded on the Meta glasses, she was not asked whether there was any additional footage from the glasses or the dashcam that was not downloaded and provided to the Government.

something happened to his shirt in the wood," when he got out of the truck to get the 2 x 4's.  When defense counsel continued to question her about the collar, she said, she did not put her hands on him "in the car," and then when she was asked "where did you do it," L.T. appeared to change her story and testified she had to hold on to the Defendant in the car because he was driving so aggressively.

L.T.'s narrative for the camera also casts a shadow on her credibility.  Namely, despite admitting Defendant never touched her, she tells the camera repeatedly that he hit her, including when the two are traveling toward the patrol car.

Likewise, L.T. told Officer Roa she "jumped" out of the truck onto the asphalt while it was still moving, but that is not consistent with the video footage, which shows the car had stopped and L.T. was able to step out of the vehicle.

In sum, when reviewed in light of the video evidence, the Court finds L.T.'s testimony to be either contrary to the video or unsupported by it.  Thus, based on the totality of the circumstances, the Court does not find evidence sufficient to show beyond a reasonable doubt that Defendant, by his words or conduct, threatened to inflict injury on L.T. or, with an apparent present ability to do so, caused a reasonable apprehension of immediate bodily harm.

Accordingly, IT IS THE COURT'S JUDGMENT, as announced in open court on February 2, 2026, that the Defendant is NOT GUILTY.

DONE AND ORDERED this 3rd day of February, 2026.

/s/ Hope Thai Cannon
**HOPE THAI CANNON**
**UNITED STATES MAGISTRATE JUDGE**